IN THE MATTER OF: B.M.
No. COA07-525
Court of Appeals of North Carolina.
Filed October 2, 2007
This case not for publication
E. Marshall Woodall and Duncan B. McCormick, attorneys for petitioner-appellee Harnett County Department of Social Services.
Pamela Newell Williams, attorney for appellee guardian ad litem for the minor children.
Richard Croutharmel, attorney for respondent-appellant father.
Peter Wood, attorney for respondent-appellant mother.
STROUD, Judge.
Respondent father ("father") and respondent mother ("mother") (together, "respondents") appeal the adjudication and disposition orders adjudicating the minor child, Beth[1], as neglected and awarding full custody of the child to Harnett County Department of Social Services ("DSS"). Mother is the birth mother of three children, Ned, Carl, and Beth. Father is the biological father of Carl and Beth.
In 2004, respondents and Ned lived in the home of Ned's maternal grandmother. On 11 June 2004, Ned was adjudicated to be neglected due to the unsanitary condition of the home, and DSS entered into a family services case plan with mother. However, after mother failed to comply with the case plan, reunification efforts were ceased. The mother's parental rights as to Ned were terminated on 18 October 2005.
In July 2005, mother gave birth to Carl. DSS began intensive case management services soon after Carl's birth because of mother's history with Ned. Services included weekly visits by a social worker. A case plan was developed including, inter alia, parenting skills training with a social worker, a mental health evaluation and a vocational rehabilitation program. Father was required to participate in a psychological evaluation and assist in seeking the services outlined for Carl in the case plan.
On 2 December 2005, when Carl was almost six months old, DSS filed a juvenile petition alleging that Carl was a neglected juvenile. On 23 March 2006, Carl was adjudicated as neglected. As a basis for this adjudication, the trial court relied upon both the respondents' failure to comply with the case plan developed for Carl as well as the prior adjudication of neglect and subsequent termination of parental rights as to Ned. In particular, the trial court found that mother failed to follow through on mental health treatment and to attend vocational rehabilitation and father failed to obtain a psychological evaluation. In addition, the trial court found that respondents had delayed seeking medical attention for Carl after the social worker telephoned respondent father and told him about the need to take Carl to a pediatrician. Carl was subsequently diagnosed with an upper-respiratory infection. Respondents appealed the adjudication and disposition orders as to Carl, and, on 15 May 2007, this Court affirmed in part and dismissed in part. See In re C.M., __ N.C. App. __, 644 S.E.2d 588 (2007).
In August 2006, mother gave birth to Beth. Though DSS was aware that mother was pregnant, DSS learned of Beth's birth in October 2006 when mother had called DSS to say that respondents had not received notice of a permanency planning action team meeting for Carl. On 2 October 2006, DSS investigation and assessment social worker, Crystal Reed ("Reed"), received a report regarding Beth. On 3 October 2006, Reed prepared and filed a juvenile petition alleging that Beth was neglected and dependent. On that same date, the trial court entered a non-secure custody order, and Reed went to the home of Beth's paternal grandmother, D.M., to remove the child.
When Reed arrived, she found father, but mother and Beth were not home. Father told Reed that mother had taken Beth to a doctor's appointment but did not know when they would return. When Reed returned later that afternoon, father told her that he had informed mother that DSS was looking for her and for Beth. Thereafter, Reed, with the assistance of local law enforcement, searched for mother and Beth for approximately one month. Reed testified that she returned to D.M.'s house approximately twelve times looking for mother and Beth.
On 6 November 2006, DSS finally located mother and Beth and took custody of Beth at a pediatric clinic when respondents arrived with Beth for an appointment. Reed testified that with the exception of a "little bit of cradle cap," Beth appeared well-cared for and well-nourished. As Reed was taking custody of Beth, mother refused to tell Reed where she was living. However, when father later phoned Reed to check on how Beth was doing, he informed Reed that they were residing with his brother and gave her the address and phone number. Reed never visited this residence. An adjudication and disposition hearing was conducted on 5 January 2007. Following the hearing, the trial court adjudicated Beth as neglected. Respondents now appeal.
We first address respondents' claim that there was insufficient evidence to support the trial court's conclusion that Beth was a neglected juvenile.
A "neglected juvenile" is
a juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law. In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect or lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.
N.C. Gen. Stat. § 7B-101(15) (2005). This Court has further required that "there be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide ' proper care, supervision, or discipline'" to adjudicate a juvenile neglected. In re Safriet, 112 N.C. App. 747, 752, 436 S.E.2d 898, 901-02 (1993) (emphasis added). "It is well-established that the trial court need not wait for actual harm to occur to the child if there is a substantial risk of harm to the child in the home." In re T.S., III, 178 N.C. App. 110, 113, 631 S.E.2d 19, 22, rev. denied, 360 N.C. 647, 637 S.E.2d 218 (2006), aff'd, 361 N.C. 231, 641 S.E.2d 302 (2007). However, allegations of neglect must be proved by "clear and convincing evidence." N.C. Gen. Stat. § 7B-805 (2006). "Clear and convincing evidence is greater than the preponderance of the evidence standard required in most civil cases. It is defined as evidence which should fully convince." In re Smith, 146 N.C. App. 302, 304, 552 S.E.2d 184, 186 (2001) (internal citations and internal quotations omitted).
Respondents assert that DSS failed to proffer sufficient evidence specifically related to the care and supervision of Beth. They contend that in concluding that Beth was neglected, the trial court erred when it relied, almost exclusively, on the prior neglect adjudications of two other children.
We have held that an adjudication of neglect may be based on conduct occurring before a child's birth. In re A.B., found that prior abuse and neglect of sibling and the mother's failure to comply with the orders entered in the sibling's case supported the conclusion that a younger child was neglected. ___ N.C. App. ___, ___, 635 S.E.2d 11, 16-17 (2006).
However, we have also recognized that the extent to which the trial court may rely upon such prior adjudications has its limits. See In re A.K., 178 N.C. App. 727, 731-32, 637 S.E.2d 227, 229-30 (2006). In the case of In re A.K., we held that the prior adjudication of neglect of a sibling several months earlier, standing alone, was insufficient to support a subsequent adjudication of neglect with respect to another child where there was no evidence that the conditions that led to the prior adjudication still existed. Id; see also, In re Ellis, 135 N.C. App. 338, 342, 520 S.E.2d 118, 121 (1999) (affirming trial court's conclusion of no neglect for two children where older sibling died in the home because there was insufficient evidence to demonstrate that the children would be subject to a risk of future harm).
The record in the case before us reveals that DSS made no factual investigation regarding the status of Beth's health or well-being or the appropriateness or safety of the environment in which she was living prior to filing the juvenile petition. As a result, the juvenile petition contains no specific allegations relating to Beth. The petition alleged only that two children previously were removed from respondents' home due to their "failure to extend proper care and supervision." The petition also alleged that respondent-mother suffered from mild mental retardation and a mood disorder and that father was also mildly mentally retarded and had limited cognitive abilities. The petition further alleged that respondent-mother had been uncooperative in participating in recommended treatment "during DSS involvement with the older children."
At the adjudication hearing, Reed testified that the allegations in the petition were based entirely on what had happened in the previous case and she admitted that there was no new evidence available at the time she drew the petition of specific neglect related to Beth. She further admitted that prior to the filing of the petition, she made no contact with either of the guardians ad litem that had been appointed for respondents in the prior actions. The testimony of two other social workers involved in the case indicates that, except for the phone call in which mother disclosed that she had given birth, they also had no contact with respondents prior to Beth's removal. In essence, the juvenile petition alleging that Beth was neglected was filed solely on the basis of the prior adjudications of Ned and Carl.
In its adjudication order, the trial court made several findings about the two prior minor children and the respondents' interactions with DSS relating to those children. In fact, the trial court specifically found that the juvenile petition filed with respect to Beth "was based upon the history of the two other juveniles being removed from the parents upon findings of neglect and dependency." However, the only findings made by the trial court that related specifically to the respondents' care of Beth were as follows: 1) the respondents "evaded contact with DSS for approximately one month" while DSS attempted to serve the juvenile petition on the respondents; 2) when the juvenile was finally removed from respondents during Beth's appointment at a children's clinic, a review of Beth's medical records indicated multiple visits to the clinic; 3) respondents had fed Beth "baby food, bananas, from a jar, in addition to baby formula" food, which was inappropriate nourishment for a child of that age and was also a "health hazard" by way of choking, although there was no evidence that the child choked on the baby food; 4) respondents "were the primary caretakers of [Beth] from her birth on August 28, 2006 until her removal from [respondents] on November 6, 2006"; 5) at the time of Beth's removal, Beth was "clean, appropriately dressed and was apparently healthy;" 6) since Beth's removal, respondents had attended nine of eleven scheduled visits with Beth after her placement in foster care, but were late for several of the visits; and 7) during the visits with Beth, the respondents were "appropriate with the child and nurturing to the child" and "the parents and the child ha[d] formed a bond."
In addition to citing the adjudication of Ned and Carl, the trial court also relied upon the reports and testimony of a psychologist, David Rodamacher ("Rodamacher"), who evaluated the respondent-mother on 16 August 2004 and respondent-father on 31 January 2006 for the purposes of the prior juvenile petitions. Based on this evidence, the trial court found that "[t]he parents are not mentally capable of parenting a child without the help of some responsible adult." While the trial court's finding is generally reflective of Rodamacher's testimony, it does not reflect the extent of the supervision he recommended. Rodamacher testified that both respondents had mild mental retardation and that respondent-mother had an unspecified mood disorder. Based on these diagnoses, Rodamacher concluded that respondents would be able to care for a child within a "typical routine," but felt that it would be important to have someone "checking in regularly to make sure that the routine is maintained" and "to help make judgments." He further qualified his conclusion that live-in supervision would not be required but rather suggested that someone visit "weekly or more" to "see how things are going."
This testimony combined with the evidence that Beth appeared healthy and that she was under the care of a pediatrician after having been in the respondents' custody for a period of over two months prior to her removal does not support the trial court's conclusion that Beth was, or had been, neglected. We conclude that the trial court erroneously concluded that Beth was a neglected juvenile "because the juvenile did not receive proper care and supervision from the respondent parents and the juvenile has been allowed to live in an environment injurious to the juvenile's welfare."
Neither does the evidence support an alternative conclusion, which would have been a more appropriate consideration in this particular case, that Beth was at a substantial risk of impairment. See In re Safriet, 112 N.C. App. at 752, 436 S.E.2d at 901-02. To the contrary, the evidence demonstrates that respondents are capable of caring for Beth with appropriate services and monitoring. While the trial court made the finding that DSS had made "reasonable efforts to prevent foster care placement of the juvenile by extension of case management services after investigations and reports" the record before us is completely devoid of any evidence that DSS made any such efforts as to Beth.
For the foregoing reasons, we conclude that the trial court's findings, combined with the complete lack of any evidence of the current care environment being provided by the respondents at the time that the juvenile petition was filed, are insufficient to support the trial court's conclusion that Beth was a neglected juvenile. Consequently, the adjudication and disposition orders are reversed. We conclude that the orders must be reversed, and thus we do not address respondents' remaining assignments of error.
REVERSED.
Judges STEELMAN and JACKSON concur.
Report per Rule 30(e).
NOTES
[1] The names of all minor children have been changed to protect their identity pursuant to N.C.R. App. P. 26(g)(4).